*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

Michael T. Pieja (CA Bar No. 250351)
Alan E. Littmann (*pro hac vice*)
Jennifer Greenblatt (*pro hac vice*)
Doug Winnard (CA Bar No. 275420)
Andrew J. Rima (*pro hac vice*)
Emma C. Ross (*pro hac vice*)
Lauren Abendshien (*pro hac vice*)
Shaun Zhang (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
564 W. Randolph St., Suite 400
Chicago, IL 60661
Tel: (312) 681-6000
Fax: (312) 881-5191
mpieja@goldmanismail.com
alittmann@goldmanismail.com
jgreenblatt@goldmanismail.com
dwinnard@goldmanismail.com
arima@goldmanismail.com
eross@goldmanismail.com
labendshien@goldmanismail.com
szhang@goldmanismail.com

*Attorneys for Defendant Apple Inc.*

(Additional counsel listed in signature block)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNILOC USA, INC., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>APPLE INC.,<br><br>    Defendant. | Case Nos.  3:18-cv-00360-WHA<br>3:18-cv-00363-WHA<br>3:18-cv-00365-WHA<br>3:18-cv-00572-WHA<br><br>**DEFENDANT APPLE INC.'S MOTION FOR RECONSIDERATION OF THE ORDER DENYING APPLE'S MOTION TO DISMISS**<br><br>JUDGE: Hon. William Alsup |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

I.  INTRODUCTION ........................................................................................................... 1

II. LEGAL STANDARDS ................................................................................................... 2

III. ARGUMENT ................................................................................................................... 2

    A.  Plaintiffs Did Not Cure Any Events of Default ............................................... 2

        1) A Cure Requires Elimination or Correction of a Default ................... 3

        2) Plaintiffs Never Eliminated or Rectified Any Event of Default ...... 4

        3) The Palmer Declaration Provides No Evidence of Cure ................. 5

    B.  The June 2017 Default Was Not Cured ........................................................... 7

    C.  Fortress's Knowledge and Conduct Cannot Nullify Any Event of Default Under Any Alternative Legal Theory ............................................................. 9

    D.  The Order Improperly Resolved Issues of Credibility .................................. 10

IV. CONCLUSION .............................................................................................................. 12

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

## TABLE OF AUTHORITIES

**CASES**

*Bakalis v. Bakalis*,
   88 N.Y.S.3d 899 (N.Y. App. Div. 2018) ................................................................................3

*Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y. 2012) ................................................................................3, 7

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
   720 F.3d 84 (2d Cir. 2013) ................................................................................................9, 10

*Gray v. Golden Gate Nat. Recreational Area*,
   866 F. Supp. 2d 1129 (N.D. Cal. 2011) ..................................................................................2

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012) ..................................................................................................11

*In re Taddeo*,
   685 F.2d 24 (2d Cir. 1982) ......................................................................................................3

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990) ....................................................................................................4

*Riesett v. W.B. Doner & Co.*,
   293 F.3d 164 (4th Cir. 2002) .................................................................................................10

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*,
   343 F.3d 1036 (9th Cir. 2003) ...............................................................................................10

*Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*,
   5 F.3d 1255 (9th Cir. 1993) .....................................................................................................2

*SEE, Inc. v. See Concept SAS*,
   2017 WL 768616 (E.D. Mich. Feb. 28, 2017) ........................................................................3

*Shred-It USA Inc. v. Mobile Data Shred*,
   222 F. Supp. 2d 376 (S.D.N.Y. 2002) ...................................................................................11

*Snapp v. United Trans. Union*,
   889 F.3d 1088 (9th Cir. 2018) ...............................................................................................11

*United States v. Ruiz-Gaxiola*,
   623 F.3d 684 (9th Cir. 2010) ...................................................................................................2

**OTHER AUTHORITIES**

3A Corbin, Contracts § 702 ........................................................................................................10

*Black's Law Dictionary* (10th ed. 2014) ......................................................................................3

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

*Merriam-Webster's Collegiate Dictionary* 284 (10th ed. 1999) ......................................................... 3

*The American Heritage Dictionary* 323 (11th ed. 2003) .................................................................. 3

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

**I.     INTRODUCTION**

Plaintiffs and their lender, Fortress, entered into a multi-million-dollar Revenue Sharing Agreement. As part of that bargain, Plaintiffs committed to generating a minimum amount of revenue on a quarterly basis. The agreement was unambiguous: if Plaintiffs did not satisfy their revenue requirement, they were automatically in default. And if Plaintiffs were in default, Fortress automatically gained an unfettered right to sublicense any of Plaintiffs' patents. When Plaintiffs and Fortress amended their agreement on May 15, 2017, they did not change these promises or the consequences of breaking them. Instead, they "ratified and confirmed" them. (Ex. A, Third Amendment to Revenue Sharing Agreement at Section 4.).

The undisputed facts show that Plaintiffs twice breached the revenue requirement. No one suggested that these promises, or breaches of them, were unimportant. No one, that is, until Apple pointed out the legal consequence of a breach in its motion to dismiss—Plaintiffs' loss of the exclusionary rights they needed to have standing to sue. Only then, in opposing Apple's motion, did Fortress employee James Palmer suggest that the revenue requirements were unimportant and that Fortress had been happy with Plaintiffs' revenues. Relying on this testimony, the Order denying Apple's motion to dismiss concluded that Plaintiffs cured their events of default. (Dkt. No. 164-2 at 6–7.)[1] Apple now respectfully requests that the Court reconsider its Order for three reasons.

First, Plaintiffs did not cure any of their defaults as a matter of law. A cure requires the party in default to eliminate the event triggering that default. A cure thus differs from a waiver, which focuses on the behavior of the non-breaching party, who forgives or ignores the default. Thus, in order to cure an Event of Default under the terms of the agreement, Plaintiffs had to eliminate their revenue shortfalls of March 2017 and June 2017. Plaintiffs never did so, nor did they come close. Nothing in the Palmer Declaration suggests otherwise. The record thus contains no legally cognizable evidence of cure.

Second, Plaintiffs defaulted twice: once at the end of March 2017, and again at the end of June 2017. The only evidence cited in the Order relates to events occurring in May 2017. Even if

---

[1] Documents referenced herein are to case number 3:18-cv-00360-WHA, unless noted otherwise.

those events could cure the March 2017 default, they could not have cured a default that had not yet occurred. And, based on the express terms of the agreement, a cure of the March 2017 default could not effect a waiver or cure of the subsequent June 2017 default.

Third, the Order prematurely resolved issues of credibility against Apple even though Plaintiffs bear the burden of proving standing. In the Order denying Apple's motion to dismiss, Mr. Palmer's declaration was credited as uncontroverted. (Dkt. No. 164-2 at 7.) Even assuming that Mr. Palmer's declaration sufficed to show a cure—which it does not—the record contains ample evidence to contradict its assertions. Mr. Palmer's declaration repeatedly contradicts both the terms of the agreement and the testimony of Plaintiffs' 30(b)(6) designee. Crediting Mr. Palmer's declaration to the exclusion of contrary evidence necessarily entailed credibility determinations that would have been properly left for an evidentiary hearing before a finder of fact. Although Apple believes that the Court should reconsider its Order and find that no cure occurred, in the alternative, the Court should vacate the Order and permit a finder of fact to resolve these credibility issues.

## II. LEGAL STANDARDS

"Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). "[A] district court also has inherent authority to reconsider an interlocutory decision to prevent clear error or prevent manifest injustice." *Gray v. Golden Gate Nat. Recreational Area*, 866 F. Supp. 2d 1129, 1132 (N.D. Cal. 2011). Although the Ninth Circuit has not articulated the bounds of "clear error" in the context of reconsideration, it has stated that a factual finding is "clearly erroneous" when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 693 (9th Cir. 2010).

## III. ARGUMENT

### A. Plaintiffs Did Not Cure Any Events of Default

Citing the declaration of James Palmer, the Order found that "plaintiffs had in fact cured the alleged events of default." (Dkt. No. 164-2 at 7.) But this finding relied on a "cure" that does not

meet the term's legal meaning or comport with how the term was used in the agreement. In addition, the finding of a cure did not consider contrary factual evidence and credited Plaintiffs' unsupported legal conclusions as statements of fact.

### 1) A Cure Requires Elimination or Correction of a Default

The agreement uses the term "cure" but does not define it. Under New York law, which governs the agreement, the term is given its plain meaning. *Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 648–49 (S.D.N.Y. 2012). "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions." *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982); *see also Bank of New York Mellon*, 910 F. Supp. 2d at 649. "Dictionaries agree that curing connotes correction, elimination, or rectification." *SEE, Inc. v. See Concept SAS*, No. 16-13261, 2017 WL 768616, at \*4 (E.D. Mich. Feb. 28, 2017) (citing *Merriam-Webster's Collegiate Dictionary* 284 (10th ed. 1999) ("to deal with in a way that eliminates or rectifies"); *The American Heritage Dictionary* 323 (11th ed. 2003) ("to get rid of" or "to remedy")).

The agreement uses cure consistently with its plain meaning. Section 7.3(y) states that an Event of Default shall continue until "[Plaintiffs have] cured such Event of Default . . . or such Event of Default otherwise ceases to exist." (Dkt. No. 134-7 at § 7.3(y).) Thus, to fall within Section 7.3(y), the Event of Default must no longer exist, whether by Plaintiffs' action ("cured") or by some other means ("otherwise"). In contrast, the waiver provision of Section 7.3(x) does not require that the Event of Default cease to exist. Instead, it requires action on the part of Fortress to waive an Event of Default in writing. (*Id.* § 7.3(x)); *see Bank of New York Mellon*, 910 F. Supp. 2d at 649 ("waiver" and "cure" presumed to have different meanings); *compare Black's Law Dictionary* (10th ed. 2014) (defining "waiver" as the "abandonment . . . of a legal right") *with id.* (defining "cure" as the "remov[al of]" one or more "legal defects"). A "cure" by Plaintiffs is thus both separate and distinct from a waiver by Fortress, and to have effected a cure, Plaintiffs must have remedied each of their revenue shortfalls such that those shortfalls no longer existed. *See Black's Law Dictionary* (defining "cure of default" as "[a] *debtor's* act to correct its failure to perform") (emphasis added); *Bakalis v. Bakalis*, 88 N.Y.S.3d 899, 900 (N.Y. App. Div. 2018)

("[T]he defendant . . . cured his default in payment . . . by making the required payment . . . on the cure date fixed by the plaintiff.").

### 2) Plaintiffs Never Eliminated or Rectified Any Event of Default

Plaintiffs do not dispute that they repeatedly breached Section 6.2.2 of the Revenue Sharing Agreement by failing to generate the minimum revenue required as of each of March 31, 2017, and June 30, 2017. And neither of these failures was a close call: Plaintiffs were well short of their revenue requirement as of each date. In order to cure their defaults, Plaintiffs would have needed to have generated the revenue required by Section 6.2.2. Plaintiffs never did.

As an initial matter, the agreement does not state how Plaintiffs could have cured a default under Section 6.2.2 or by when they must have done so. The agreement provides no cure period, and it gives Plaintiffs no time to comply with Section 6.2.2 before a default is deemed to occur; a breach of that covenant is automatically a default. (Dkt. No. 134-7 at § 7.1.2.) Nor does the agreement explain how to count revenue generated after March 31, 2017 in the event of a default: does that revenue count only towards a cure of a past default, or only to the next quarterly minimum, or both? The lack of both a cure period and an explanation as to how a cure would work suggests that Plaintiffs may have had no opportunity to cure a breach of Section 6.2.2 at all. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 890 (2d Cir. 1990) (court cannot modify the "right to cure that was bargained for"). Plaintiffs bear the burden to show a cure, and yet they did not offer any explanation as to what a cure would have looked like or by when they needed to act. For at least this reason, Plaintiffs have not shown that they cured any default.

Even assuming a cure were possible, the evidence does not support a finding that Plaintiffs cured their default at any time relevant to these actions. Curing a revenue shortfall would have required, at a minimum, that Plaintiffs make up that shortfall. But Plaintiffs missed their March 31, 2017 revenue target by ███████████████████████████████████████████████████████████ The revenue Plaintiffs generated between their March 2017 default and the May 15, 2017 amendment was a drop in the bucket

compared to the total shortfall; it did not cure Plaintiffs' March 2017 default. And Plaintiffs again fell far short of the revenue requirement on June 30, 2017, resulting in a second breach. (Dkt. No. 134-4 at 11.) Thus, the evidence shows that Plaintiffs never met their revenue targets and never cured their defaults.

Nor did Plaintiffs—either in their papers here or back in 2017—identify any plan to cure their breach. Section 6.5.1.2 required Plaintiffs, upon learning of an Event of Default, to give Fortress notice as to "what action [Uniloc] has taken, is taking or proposes to take" to rectify their default. (Dkt. No. 134-7 at § 6.5.1.2.) Plaintiffs never provided any such notice. (Ex. B, Levy Dep. 83:22–84:7.) Instead, Plaintiffs apparently did not even realize that they had defaulted: whether an Event of Default had occurred did not "even cross[] the mind of anyone at Fortress or Uniloc Luxembourg." (Dkt. No. 141-6 at 11.) But their ignorance is no defense: the agreement provided that a breach of Section 6.2.2 would constitute a default automatically, regardless of whether or when the parties recognized it. The fact that Plaintiffs admit that they did not realize the breach and never provided a plan to address it is further evidence that they never took any affirmative steps to effect a cure.

### 3) The Palmer Declaration Provides No Evidence of Cure

In concluding that Plaintiffs cured their defaults, the Order relied entirely on the declaration of James Palmer. (Dkt. No. 164-2 at 6–7.) But Mr. Palmer did not describe any facts that could support a conclusion that such a cure occurred.

The Palmer Declaration uses the word cure. The actions it describes, however, cannot qualify as a cure as a matter of law. Nowhere in his declaration does Mr. Palmer refer to any actions that ***Plaintiffs*** took to fix an Event of Default, let alone describe how or when ***Plaintiffs***, in fact, eliminated any of their revenue shortfalls. Indeed, Mr. Palmer's declaration offers no facts regarding Plaintiffs' conduct at all. Crucially, it does not provide any facts regarding the amount of revenue obtained by Plaintiffs—the issue governing their default. To the contrary, Mr. Palmer speaks solely to ***Fortress's*** conduct and state of mind. (*E.g.*, Dkt. No. 141-7 at ¶ 11 (stating that "[F]ortress did not regard Uniloc as in default . . . , and Fortress did not consider it or treat it as a default"); *id.* at ¶ 12 (stating that "[F]ortress did not view" the shortfall as "an Event of Default"))

Case 3:18-cv-00363-WHA   Document 164   Filed 03/04/19   Page 10 of 18

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

(internal quotation marks omitted).) According to Mr. Palmer, Fortress was "satisfied" not because Plaintiffs had fixed their revenue shortfalls, but because Fortress no longer minded if Uniloc missed the revenue targets. (*Id.* at ¶ 10 ("[T]he earlier minimums [were] no longer of significance to Fortress.").) This is not evidence that Plaintiffs cured the default such that it ceased to exist.

The only explanation Mr. Palmer provides regarding a cure is that "Fortress's signature to the May 15 Agreement establishes Uniloc had cured that ostensible 'Event of Default' to Fortress's satisfaction." (Dkt. No. 141-7 at ¶12.) This statement is a legal conclusion, not a fact that could be observed by a lay witness. And, even assuming Fortress could cure Uniloc's default, Mr. Palmer's analysis of the legal consequences of the May 15 Amendment is wrong. The May 2017 amendment made clear that Fortress was ***not*** relinquishing any rights it had: "The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Collateral Agent or any Purchaser under the Agreement or any Document, nor constitute a waiver of any provision of the Agreement or any Document." (Ex. A at Section 4.) Rather than "wip[e] the slate clean" (Dkt. No. 141-7 at ¶ 12), Fortress expressed its intent in writing to retain its remedies for a default.

Mr. Palmer further suggested that the revenue minimums of Section 6.2.2 were "no longer of significance to Fortress . . . as of May 15, 2017." (Dkt. No. 141-7 at ¶ 10.) But the May 2017 amendment did not remove or lower the minimums, or change the consequences flowing from the failure to satisfy them. Instead, Fortress and Plaintiffs retained the same requirements—and the same consequences for breaching them: "Except as specifically amended or waived above, the Agreement . . . shall remain unchanged and in full force and effect and [is] hereby ratified and confirmed." (Ex. A at Section 4.)

The meager facts Mr. Palmer provides about Fortress's state of mind are directed, at most, to an argument that Fortress impliedly waived a default. But section 9.4.2 of the agreement forbids implied waivers of any default. (*See* Dkt. No. 164-2 at 7.) Indeed, if Fortress's being "satisfied" were interpreted as a "cure" of a default—absent any remedial action by Plaintiffs—then both Section 7.3(x) (requiring waivers of Event of Default to be in writing) and Section 9.4.2 (barring

APPLE'S MOTION FOR RECONSIDERATION OF THE
ORDER DENYING MOTION TO DISMISS

6

CASE NOS. 3:18-CV-00360-WHA;
-00363-WHA; -00365-WHA; -00572-WHA

implied waivers) of the agreement would be superfluous.[2] Under Mr. Palmer's logic, if Fortress tried to waive a default orally by stating that it was happy with Plaintiffs' efforts, that would automatically evidence a cure. That, in turn, would render Section 7.3 of the agreement's requirement of a written waiver a nullity—a result that is wrong as a matter of law. *Bank of New York*, 910 F. Supp. 2d at 649 ("[A] contract should be construed so as to give full meaning and effect to all of its provisions.") (citation and internal quotation marks omitted). In essence, Mr. Palmer claims Fortress was satisfied not because of any cure, but in spite of one. This is a claim of implied waiver and does not support a finding that any cure occurred.

The agreement and May 2017 amendment thus provide no factual support for the legal conclusion that Mr. Palmer draws. These documents show that Fortress wanted to, and did, preserve all of the rights that it had bargained for as an "insurance policy" should circumstances change, or should Fortress simply change its mind. Whatever Mr. Palmer may now claim, there is no factual dispute that Fortress specifically bargained for such a policy and then refused in writing to relinquish it. The Order thus erred by adopting Mr. Palmer's suggestion that a cure occurred, and reconsideration is appropriate.

**B.    The June 2017 Default Was Not Cured**

Apple presented undisputed evidence of two Events of Default: one on March 31, 2017, and another on June 30, 2017. (Dkt. No. 134-4 at 4, 11.) The Order concluded that both Events of Default had been cured. (Dkt. No. 164-2 at 7.) But the purported evidence of cure cited in the Order concerned only events leading up to May 15, 2017. (*Id.* at 6–7; Dkt. No. 141-7 at ¶¶ 9–12.) The Order found, for instance, that the fact that "Fortress chose to execute a third amendment to the Revenue Sharing Agreement . . . on May 15, 2017 . . . indicates that plaintiffs cured the purported default." (Dkt. No. 164-2 at 6; *see also id.* ("Again, the fact that Fortress executed the third amendment to the agreement [on May 15] in spite of this knowledge . . . shows that plaintiffs had cured that alleged default.").)

---

[2] Mr. Palmer also appears to suggest that the act of executing the May 2017 amendment effected a cure. (Dkt. No. 141-7 at ¶ 12.) This interpretation is foreclosed by the express language of Section 7.3(z), which states that an amendment must explicitly indicate that it is curing defaults in order to do so, and is contrary to Plaintiffs' 30(b)(6) testimony. (Dkt. No. 134-10, Levy Dep. 89:24–90:15.)

But the pre-June 2017 events could not have cured the June 2017 default for the simple reason that it had not yet taken place. Further, the agreement specifically forecloses any argument that curing the March 2017 default somehow prospectively cured the June 2017 one. Specifically, Section 7.3 of the agreement states that no cure or waiver "shall prevent the occurrence of, or effect a waiver with respect to, any subsequent Event of Default or impair any rights of the parties hereto upon the occurrence thereof." (Dkt. No. 134-7 at § 7.3.) Thus, even if the March 2017 default were cured based on actions taken by May 15, 2017, those actions could not also have cured the yet-to-occur June 2017 default.

Rather, the June 2017 default would have been cured only if there were evidence from after June 30, 2017, showing such a cure. The record contains no such evidence. Only once does Mr. Palmer describe events from after even May 15 (much less June 2017): In paragraph 8 of his declaration, he asserts that Fortress was satisfied that Plaintiffs "diligently pursue[d] monetization," "provide[d] regular updates to Fortress," and "consult[ed] with Fortress as to Uniloc's activities if requested" through August 2, 2017. (Dkt. No. 141-7 at ¶ 8.) This has nothing to do with whether Plaintiffs cured their revenue shortfall. In fact, the activities Mr. Palmer lists were required by Section 6.2.1 of the agreement—a covenant that is both separate from and in addition to the revenue requirement of Section 6.2.2. (Dkt. No. 134-7 at § 6.2.1.) Mr. Palmer's claim in paragraph 8 is simply a statement that Plaintiffs did not breach Section 6.2.1 of the agreement. His declaration is conspicuously silent as to Plaintiffs' compliance with, or efforts to cure their breach of, the revenue requirement of Section 6.2.2 after May 15, 2017. (Dkt. No. 141-7 at ¶ 8.)

The existence of the June 2017 default is relevant because it deprived Plaintiffs of standing to bring three of the four suits pending before the Court. Each of these three cases was filed in the five weeks after June 30, 2017. *See* Case No. 3:18-cv-00363-WHA, Dkt. No. 1 (filed July 12, 2017); Case No. 3:18-cv-572, Dkt. No. 1 (filed July 12, 2017); Case No. 3:18-cv-365, Dkt. No. 1 (filed August 2, 2017). The Order's conclusion that "no relevant event of default existed at the time plaintiffs filed the suits" (Dkt. No. 164-2 at 7) was therefore incorrect. At the time Plaintiffs filed the -363, -365, and -572 actions, Fortress was vested with an unfettered right to grant sublicenses to the patents-in-suit. For the reasons explained in Apple's motion to dismiss, Fortress's unfettered

right deprived Plaintiffs of constitutional standing at the time of filing for each of these three actions.

### C. Fortress's Knowledge and Conduct Cannot Nullify Any Event of Default Under Any Alternative Legal Theory

In finding that all defaults were cured, the Order relied primarily on three facts: (1) Fortress "indicated its continued satisfaction" with Plaintiffs' performance; (2) Fortress knew about the revenue numbers giving rise to the March 2017 default; and (3) Fortress signed the May 2017 amendment. (Dkt. No. 164-2 at 6.) Just as these facts cannot support a finding of cure, they cannot support any alternative legal ground for concluding that the defaults otherwise ceased to exist.

First, Fortress's knowledge and conduct cannot qualify as a waiver. The agreement required all waivers to be in writing (Dkt. No. 134-7 at § 7.3(x)), and expressly forbid implied waivers (Dkt. No. 146-8 at § 9.4.) Nothing in the record suggests that Fortress "indicated its continued satisfaction" to Uniloc in writing. (Dkt. No. 164-2 at 6.) And Plaintiffs have not produced anything purporting to be an express, written waiver—a document they presumably would have produced long ago if it existed. Moreover, the May 2017 amendment states that it does not waive any of Fortress's rights or remedies. (Ex. A at Section 4.) Thus, even if the agreement's prohibition on implied waivers were not sufficient, Fortress's express disavowal of any waiver is sufficient proof that no implied waiver existed.

Second, any acquiescence by Fortress to Plaintiffs' defaults cannot operate as a form of estoppel that would have prevented Fortress from claiming that a default existed. "[A] party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013). Fortress had no obligation to declare an Event of Default because Plaintiffs' breach of Section 6.2.2 automatically triggered such a default. (Dkt. No. 134-7 at § 7.1.2); *see Gaia House*, 720 F.3d at 90 (lender was not estopped from alleging an Event of Default nine months after the default where the agreement provided that such Event "shall automatically exist"). If any party had an obligation to give notice of a default it was Plaintiffs, not Fortress. (Dkt. No. 134-7 at § 6.5.1.2.) Additionally, Section 8.4.4 of the agreement provides that Fortress was not "obligated to ascertain or inquire as to the

performance or observance of any of the terms of this Agreement or any other Document." (Dkt. No. 166-1 at § 8.4.4.) Likewise, Section 7.4.2 of the agreement absolved Fortress of "any requirement of diligence or promptness . . . in the enforcement of its rights." (Dkt. No. 134-7 at § 7.4.2.) These provisions relieved Fortress of any duty to speak that it may have otherwise had, and thus its silence cannot be used to conclude that a default ceased to exist.

Third, Plaintiffs cannot invoke the doctrine of "substantial performance" or principles of equity to claim that a default should not be deemed to have occurred. "[T]he doctrine of substantial performance . . . does not mean that a promisor who 'substantially performed' . . . can escape the parties' chosen remedy for [its breach]." *Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 174 (4th Cir. 2002) (citing 3A Corbin, Contracts § 702). Similarly, New York law allows considerations of equity "to prevent a substantial forfeiture occasioned by a trivial or technical breach," but "[t]he contracted-for financial consequence of the parties' own failure to do that which [they] promised to do is not a forfeiture." *Gaia House*, 720 F.3d at 94 (citations and internal quotation marks omitted). Plaintiffs agreed that the revenue requirement was sufficiently material such that a breach of that covenant would automatically constitute an Event of Default. (Dkt. No. 134-7 at § 7.1.2.) And they agreed that, following an Event of Default, Fortress would have an unfettered right to grant a sublicense to any of Plaintiffs' patents in Fortress's sole discretion. (Dkt. No. 134-8, License Agreement at § 2.1.) Plaintiffs cannot now seek to rewrite the agreement to save Plaintiffs (or Fortress) from the consequences that they agreed would flow from failing to generate the revenue as promised. *See Gaia House*, 720 F.3d at 94–95.

### D.   The Order Improperly Resolved Issues of Credibility

The Court should also reconsider its Order denying Apple's motion to dismiss because it implicitly resolved issues of credibility. Apple presented a factual challenge to Plaintiffs' allegations of standing based on substantial evidence attached to Apple's motion. As a result, the burden shifted to Plaintiffs to "furnish affidavits or other evidence necessary to . . . establish[] subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). The only evidence cited in the Order was the hindsight declaration of James Palmer, which the Order considered uncontroverted. (Dkt. No. 164-2 at 7.) But

Mr. Palmer's testimony is contrary to the agreement, the May 2017 amendment, and Plaintiffs' 30(b)(6) testimony. And it lacks any corroborating evidence. These discrepancies raise credibility issues that should be resolved at an evidentiary hearing. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir. 2012) (noting that several circuits "explicitly prohibit district courts from resolving disputed factual questions or making credibility determinations essential to the question of standing on the basis of affidavits alone") (citation and internal quotation marks omitted).

Mr. Palmer's credibility is at issue first because he repeatedly contradicts the terms of the Revenue Sharing Agreement. He claims that the revenue minimums of Section 6.2.2 were "no longer of significance to Fortress . . . as of May 15, 2017." (Dkt. No. 141-7 at ¶ 10.) But the amendment executed on May 15, 2017, retained the same minimums and the same consequences for breaching them: "Except as specifically amended or waived above, the Agreement . . . shall remain unchanged and in full force and effect and [is] hereby ratified and confirmed." (Ex. A at Section 4.) Mr. Palmer also states that Plaintiffs' failure to generate the required revenue was "unimportant" and "not what Fortress would have regarded as a 'default.'" (Dkt. No. 141-7 at ¶¶ 10–11.) But the parties agreed that a breach of Article VI would automatically trigger a default, and they never revised the agreement to change that. Mr. Palmer's self-serving hindsight cannot be used to claim that the parties' intent was different from that professed in the agreement itself. *See Shred-It USA Inc. v. Mobile Data Shred*, 222 F. Supp. 2d 376, 379 (S.D.N.Y. 2002).

Mr. Palmer also contradicts Plaintiffs' 30(b)(6) testimony when he speculates that a cure occurred. Erez Levy, a Fortress employee involved in the transactions with Uniloc, testified as a 30(b)(6) witness that he was not aware of any such cure. (Dkt. No. 134-10, Levy Dep. 89:24–90:15.) Similarly, Mr. Palmer suggests that the May 15, 2017 amendment resulted in, or provided proof of, a cure. (Dkt. No. 141-7 at ¶ 12.) But Mr. Levy testified that, to his knowledge, the amendments to the agreement did not cure any default. (Dkt. No. 134-10, Levy Dep. 90:16–21.) To the extent Mr. Palmer's testimony contradicts Plaintiffs 30(b)(6) testimony, it should be disregarded. *See Snapp v. United Trans. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018). At a minimum, however, the conflict between Mr. Palmer's testimony and Mr. Levy's raises questions of credibility that should be resolved by a trier of fact.

Mr. Palmer's testimony is also self-contradictory. Mr. Palmer, like Plaintiffs' 30(b)(6) witness Erez Levy, repeatedly states his belief that Fortress did not realize a default had occurred at all. (Dkt. No. 141-7 at ¶ 11 ("Fortress did not regard Uniloc as in default."); *see also id.* ¶ 13 ("[A]t no time, either before or after May 15, 2017, did Fortress consider Uniloc as being in default."); Dkt. No. 134-10, Levy Dep. 90:2–24.) Not recognizing that a default occurred is inconsistent with recognizing that a default occurred but being satisfied with Plaintiffs' efforts to cure it. Thus, when Mr. Palmer surmises that a default existed but was cured, he is describing a scenario that he did not believe even existed. This explains why Mr. Palmer never states that a cure in fact occurred, what the cure supposedly was, or when it purportedly happened. This internal contradiction is yet another reason that Mr. Palmer's testimony suffers from credibility issues.

Credibility disputes cannot be resolved against Apple at this stage. Should the Court decline to find that no cure occurred as a matter of law, it should reconsider its Order and permit Apple to present disputed issues of fact to a jury.

## IV.  CONCLUSION

Apple respectfully requests the Court reconsider its January 17 Order and grant Apple's motion to dismiss. In the alternative, Apple requests that the Court vacate its Order and permit Apple to present the disputed issues to a finder of fact.

DATED: March 4, 2019                    Respectfully submitted,

  /s/ Michael T. Pieja
Michael T. Pieja (CA Bar No. 250351)
Alan E. Littmann (*pro hac vice*)
Jennifer Greenblatt (*pro hac vice*)
Doug Winnard (CA Bar No. 275420)
Andrew J. Rima (*pro hac vice*)
Emma C. Ross (*pro hac vice*)
Lauren Abendshien (*pro hac vice*)
Shaun Zhang (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
564 W. Randolph St., Suite 400
Chicago, IL 60661
Tel: (312) 681-6000
Fax: (312) 881-5191

mpieja@goldmanismail.com
alittmann@goldmanismail.com
jgreenblatt@goldmanismail.com
dwinnard@goldmanismail.com
arima@goldmanismail.com
eross@goldmanismail.com
labendshien@goldmanismail.com
szhang@goldmanismail.com

Kenneth Baum (CA Bar No. 250719)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
429 Santa Monica Boulevard, Suite 710
Santa Monica, CA 90401
Tel: (310) 576-6900
Fax: (310) 382-9974
kbaum@goldmanismail.com

*Attorneys for Defendant Apple Inc.*

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

**PROOF OF SERVICE**

The undersigned hereby certifies that a true and correct copy of **DEFENDANT APPLE INC.'S MOTION FOR RECONSIDERATION OF THE ORDER DENYING APPLE'S MOTION TO DISMISS** has been served on March 4, 2019, to all counsel of record who are deemed to have consented to electronic service.

*/s/ Michael T. Pieja*
Michael T. Pieja (CA Bar No. 250351)